Ctioner v. United States Department of Agriculture. Mr. Murphy for the petitioner. Mr. Hinge will work for the respondent. Morning, counsel. Mr. Murphy, please proceed when you're ready. May it please the court. Good morning. I plan to reserve 3 minutes for rebuttal. The Department's expansive and evolving view of liability cannot be squared with statutes. The words that Congress chose are aid, not cause or abuse. They play a key role in the statutory scheme by keeping liability for acts of third parties within bounds. These words are not novel, complicated, or ambiguous. As the Supreme Court recognized in Robster and Rosemont, secondary liability is deeply rooted in the common law and reflects a centuries-old view of liability. The Supreme Court recognized that secondary liability has been described in Rosemont. This Court recognized it in Albertson, and the Tenth Circuit recognized it in Culbertson, which interpreted nearly identical language in a department regulation. The Department's attempt to strip Men's Rehab from secondary liability is especially concerning here because the so-called benefits provided that were provided by the judicial officer are entirely legitimate business services. There was never any dispute that the services are legal, are available to millions of sellers, and that the importation here was done before the products ever reached the consumer. May I ask you, your position rests on the proposition that we ought to read knowingly and substantial assistance into the terms of the statute. And I guess I want to know, what do you think had to be known? Well, I think we sort of work through Albertson, which there have been a number of formulations over the years that have kind of condensed into a nucleus reflected in Albertson. Knowledge of the wrongdoing by the third party and substantial assistance to that wrongdoing. So it's the wrongdoing. It's knowledge of the wrongdoing that you think is essential, not knowledge of importation. Absolutely. And the reason for that is if we had knowledge just that third parties are importing things, that's an incredibly wrong concept. That's just knowledge that third parties use their services. And this actually brings up the issue that was raised last week in the Twitter versus TomNet case, where the focus is actually on the legitimate business services that are provided by Twitter and that are misused by certain entities. But I guess – I don't know that you have to – it's up to you how to pitch your argument, obviously. But I don't know that you have to have – you have to win on knowledge of wrongdoing because, as I understood your argument, there's a couple things going on here. First, there's the importation. And then there's the question of whether the importation is wrongful. And at least in some of the cases, the importation is ostensibly wrongful because of the lack of a certificate. And so part of your argument is, well, you need knowledge of the wrongdoing, meaning Amazon actually has to know something about the fact that the requisite certificate wasn't supplied. But part of your argument, I thought, was, well, Amazon at least has to be involved in the importation in some way, and it doesn't have anything to do with the importation. And that doesn't have to do with – but that latter part doesn't have anything to do with knowledge of the wrongdoing. And I guess the reason I'm asking this is the statute is interesting because the terms aid, abet, and then cause and induce, they're not tied necessarily to the violation. There's another provision that talks about violations when it allows for civil penalties or criminal penalties. And as to that, knowingly is attached to criminal penalties, but knowingly, I think, somewhat unfortunately for you, is not attached to civil penalties. I mean, you may say that, well, we should read it in any way, but the fact of the matter is you'd have to prevail on that. But on the antecedent question of the importation or the movement, that's where aid and abet comes in. It's not in the provision about violation. It's in the provision about movement slash importation. Right. The exact statutory term is aid, abet, cause, or induce, decarrying, entering, importing, mailing, shipping, or transporting. Right. All of those things were done by third parties, by these three third-party sellers, before any of these products ever reached Amazon. The carrying and so forth across the border. And importation is defined as bringing into the territorial limits of the United States. So it's not just carrying some random flights. It's carrying it into the territorial limits of the United States. That act, that specific act, was done by these third-party sellers and completed before these products ever reached Amazon. Right. And all of that has nothing to do whether there's knowledge of the violation, as far as I can tell. Because suppose, just for the sake of argument, that we were to agree with you that aid and abet just carries with it this concept of knowing and substantially assist. Let's just hypothesize that that's true. The government's going to resist that, and there may be reasons to resist that. Let's just hypothesize that's true. Even if we give you the benefit of that, what that would mean is that we would read it into the provision that has to do with carrying, importing, mailing, shipping, transporting, because that's where aid and abet appears. Right. It doesn't say that with respect to violation. Well, I think you have to know – I think in order for the knowing knowledge element of Albersam to make any sense here, it's the awareness of wrongdoing with respect to the principal violation. Principal violation here is not just carrying something. It's carrying something without a certificate. So in order for any aiding or abetting to really make sense here, there has to be knowledge of the wrongdoing, and the wrongdoing is the carrying across the border. I don't understand why you say that's the only way to make sense of it, because it seems to me it at least would be sensible to say you have to aid and abet the importation in order to come within the purview of the statute to begin. Whether then you have to know about the violation is a subsequent question. We can have a debate about that. But you at least have to – you at least have to play a substantial role, meaning substantially assist, and maybe you can attach knowingly – I don't know if you need to, but you could – with respect to the importation. If you don't substantially assist the importation or play a meaningful role in the importation or participate in the importation, then you're not within the first layer of the statute to begin with, so you never get to the question of whether you have to know the violation. Right, and I think that's the oddity here, which is the department has faced a test on not actually providing benefits or inducing or causing any actual importation. The department has created liability based on having business services or kind of creation of demand or reasons why third parties would want to import things. And so even if we ignore the knowledge element entirely, we have to look at assistance. What actual assistance was provided here in the third parties doing the carrying, transporting, so forth? Right, and the way you just put it is the assistance in the carrying, not assistance in the violation. Right. Assistance in the carrying, which seems to me – maybe I'm wrong about this, but they seem to me to be conceptually – at least potentially conceptually distinct and distinct in the statutory scheme because aid in the back modifies carry, import, not violate. Right, yes. The actual carrying or so forth is not the violation, but if we look at – because there are actually three distinct elements from CalVersTAM. There's the awareness of the wrongdoing, and then there's also the knowing, and knowingly providing substantial assistance. So even if you ignore the knowingly part or focus that just on knowing that somebody's carrying something, you still have to have the general awareness of the wrongdoing, and there's simply no awareness whatsoever here. And you can't look at the fact – you can't look broadly at the idea that there might be knowledge that some third-party sellers somewhere out there are illegally importing, because that really brings us into the problem that the government identified in its own position in the Twitter case. Where it noted – and this is page 17 of the government's amicus brief in the Twitter case last week – the knowing and substantial assistance requirement takes on particular importance where the theory of liability rests on the defendant's routine business activities for election. And this court and several other courts have noted that these knowledge and substantial assistance requirements are particularly important when you're talking about ordinary business activities. So cases like Monson, cases like Woodward, which is where the publishing test actually comes from, Woodward and Fifth Circuit, talk about how these requirements actually scale up when you're talking about ordinary business activities. But it seems to me that all that can go to the question of whether there's substantial assistance in the importation, not whether there's substantial assistance or knowledge with respect to the violation. Right. And in this case, actually, it can be resolved on a substantial assistance element because there was no assistance at all. With respect to what, though? No assistance with respect – the way I'm thinking about it is there is not – your position could be there's not assistance with respect to the importation. Not with respect to whether – there's not assistance with respect to the importation without a certificate. Actually, both are on it. There certainly is no assistance with respect to the lack of a certificate. Amazon is not responsible for that. Third-party sellers are responsible for that. It's in JA 281, 282, and then 300, 310, 282. But even beyond that, if we go down to what assistance, what in this record shows that Amazon actually provided some measurable assistance to these third-party sellers in carrying something across the border? The answer is no. Not a single thing. Amazon didn't provide any transportation. Amazon didn't order these products. The only thing in the record the government can point to is that Amazon has contracts with third-party sellers which specify that they are responsible for the importation. This is not an issue of delegating Amazon responsibilities to this country. That's an argument that's played out in this proceeding, but that is not what Amazon is arguing. The argument here is that those responsibilities rest in the first instance on the third-party server in the importation, and the contract reflects that and reinforces that. Counsel, in rereading your brief several times and the argument that was presented by the department, what struck me is that you have argued this case as though nothing relevant occurs until the goods are in Amazon's facility. My question is, in one sense, that argument could apply to ship owners, to freight carriers, airplane owners, etc. But Congress is aware that the department doesn't have offices all around the world, and that of the two parties involved with relation to goods coming into this country from abroad, who is in the better position to be able to monitor what is happening? And Congress has made a judgment, arguably, when it gives the department such very broad authority. And clearly, your client does not have to accept any of this responsibility. But it, as the nearest person subject to regulation, is, as Congress has understood it, and the department has interpreted its power over these years, and I understand it, is that your client is in the best position to know the type of information that is critical to the public health and safety and agriculture in this country. And what I didn't see in your argument is any acknowledgment of the relative position of the parties, or of why Congress would not carry over this basic approach that applies to goods. It applies to contract law in all respects, in this area where we just live through what happens when things don't work as they're supposed to. And the sort of mad cow disease, the Ebola infections, the COVID-19 infections, how else can a government protect itself other than if the foreign manufacturer takes the initiative and contacts Amazon about how it wants to sell using its site, then certain responsibilities follow. Even though, as you have argued, a contract arrangement can be written as you're arguing, but I don't see where that takes into either consideration of how the department has been interpreting its broad power for many years, how the courts have viewed that power, and what's really going on here. How do you respond to that? So there's a lot there, and I've run through my rebuttal, if I may. So let me start with, you mentioned shareholders of freight carriers. Those and other entities who engage in specific acts relative to importation, that is directly under the statute. That's carrying, transporting, shipping, mailing, and so forth. So when Congress has identified these specific activities that constitute importation of concern. Counsel, I understand you are able to draw these types of distinctions. What I'm trying to understand is congressional intent here, as interpreted by the department over all these decades. Yeah, go ahead. I'm sorry, I apologize. I want to resist the premise that the department has this history of interpreting these regulations as imposing certain liability for acts of third parties.  There are five cases cited in the department's brief, or excuse me, the judicial officer's decision, pages 21 to 22. Three of those five that are cited for proposition that the department has long interpreted as regulations as imposing certain liability for secondary liability, do not even use the words of secondary liability. The other two, Stephen Thompson and John Casey cases, those actually involve liability for acts of a principal. John Casey and Stephen Thompson cases involve liability for their own acts. So in those two cases, the department is not advocating a condensed imposition that there is this broad liability. So we can compare that to the four department cases cited in FedEx opinion at footnote four. That is a great distinction because three of those four opinions in FedEx footnote four actually do involve an identifiable page in the Federal Register where the Commerce Department, a totally different statute, says we, the Commerce Department, are interpreting our regulation as saying there is certain liability for secondary liability. And so we have a history that's totally different there. We also have Congress saying, I accept that decision. In enacting 50 U.S.C. 4826 subpart A in 2018, Congress said the borders of the department existing before the state in 2018, that's what we want. So we have a FedEx and the history is completely different. So the policy argument, who is in the best position to govern importation in the United States, it's the customs agencies, it's the inspectors and so forth. So the question I think you're advancing is, well, isn't Amazon also in some position? Well, that implies a degree of omniscience that Amazon simply does not have. And there's nothing... No, counsel, don't take the question beyond its reasonable grounds. We're not talking about omniscience. We're talking about when Amazon is contacted, assuming it is not the initiator here. It can ask questions just as it asks, well, what are you talking about? What manufactured product? How big is it? What do you... You know, a price. All these kinds of questions. I mean, these are not out of the ordinary. And I understand why your client might opt to proceed as it does. But I mean, why would Congress sanction that type of behavior? In other words, it doesn't care what comes into this country until it actually gets into this country. And that, I think, illustrates the problem with having a test as expansive as benefits provided or who's in a better position or best position for this or that. Because conceivably, there's all kinds of other entities who can also ask questions. A consumer can ask questions. Did you have a certificate with 70 of this product? There's just not a practical limitation. And I think what you're asking is, shouldn't we be looking at these larger policy issues? That is the very debate that played out in the central bank, where the majority in central bank says, okay, we have a question of aiding and abetting liability. But we don't have a statute that says it's there. How are we supposed to resolve this? And the dissent says, well, this is remedial legislation. Let's just go ahead and refer it based on these policy objectives. And the majority says no. When we're talking about aiding and abetting, we look to see if there is a statutory warrant. There isn't. End of discussion. And then it went on to say, even though these policies that are hypothesized and so forth in central bank are good, that might be something useful for Congress to do. And a good lesson from central bank is Congress did something. Congress changed the law. The new law is 15 U.S.C. 78 T subpart. So the upside, I think, of all that is the policy arguments are properly directed to Congress. You wouldn't dispute the proposition that because of the services that Amazon provides to sellers overseas, it's more likely that sellers overseas are going to import goods into the U.S. to reach a U.S. audience. Well, I think that may be correct in some instances. That would be pretty speculative because I don't know what the sales channels are for these three sellers. Is it speculative at all that Amazon advertises itself rightly as opening up an amazing marketplace to the folks with whom Amazon engages in other selling on Amazon? I can't remember the exact product. Selling on Amazon. Selling on Amazon and fulfillment by Amazon. And part of the pitch, totally understandably, is, look, if you work with us, the seas are going to open for you because we have a gateway to a marketplace that you'd otherwise have a lot more difficulty reaching. Yes. I mean, I would imagine that there are third-party sellers in foreign places who do import their things into the United States who paid for that very recently. Right. And apropos of what Judge Roberts is asking, it could be the case, I mean, Amazon could do more to make sure that the third-party sellers with whom it works are in compliance with U.S. regulations. There's a different question about whether Amazon should be legally expected and legally required to do so, but definitely Amazon could do it. Well, there's certainly nothing on the record on that, your Honor. But that highlights a bit of the arbitrariness of this whole thing. I mean, it's a proposition. I mean, there may be nothing on the record, but it just seems self-evident that Amazon obviously could ask questions. Do you have the certificates? Do you send us a copy? And that's possible. It's not to say that your client needed to do it, but it's possible. I mean, I suppose I can hypothesize situations where, yes, somebody could ask a question, but that gets into, I guess, highly arbitrariness of doing this with our foot in an adjudication where we're creating kind of a retrospective duty based on things that have already happened. I hear what you're saying. I think the proper way to resolve that is to say, if something needs to be done, what concrete needs to be done, who is to do it, apply broadly, and do that with congressional authorization by Congress changing the law, or expanding the agency's power to engage in a formal rulemaking to set that up. Right. So that would make it legally binding in a way that you think is not the case now, even if everybody can sort of hypothesize that Amazon could do it. Right. And that's just one question conceptually. Of course. We've talked this morning a fair amount, and you've talked this morning a fair amount about strict liability. But it seems to me one way to think about this case is strict liability comes in determining whether there needs to be knowledge of the violation. Even if there's no strict liability, there still has to be aiding and abetting of the importation. There has to be aiding and abetting of both. So the fact that Congress omitted a knowingly or willfully or recklessly or whatnot requirement in the penalty statute, which is an entirely separate provision of both the HPA and the EPA, does not necessarily mean that all violations are strict liability. That's the flaw in the logic of it. It is that even if the statute does allow strict liability, there's still an argument, I thought, that that doesn't matter at the end of the day for these purposes because there still has to be aiding and abetting of the importation. And then if there's aiding and abetting of the importation, it may be – suppose that there's a shipper who carries out the importation, who just carries. And then the shipper doesn't have any idea about the lack of a certification. Well, then we can have a conversation about whether the shipper is still liable because strict liability means as a carrier, you're strictly liable for carrying imported goods that don't have the requisite certification. But there would still be an antecedent question, well, is the shipper carrying? And if it's not a shipper, whatever entity is involved, is that an entity that's aiding and abetting a carrying or an importation or a movement? Correct. Seems to me to be an analytically antecedent requirement. Correct. To get to what I think the heart of the question is, even if you said there is strict liability for aiding and abetting, do we lose the answers? No, we win because there still has to be aiding and abetting the actual carrying and so forth. And there's absolutely nothing in the record to indicate any Amazon assistance, substantial and substantial aid, on those specific items that have to be aided or abetted. Let me make sure my colleagues don't have... Can I go first? Yeah, of course. I have some kind of like stacked questions that I could ask the government to listen to as well. And you tell me if I'm right and then if the government disagrees with you, it can tell me. I have to ask them twice. In this situation, it was a Chinese company that shipped the product to an American port. Am I right so far? Correct. L.A. and San Francisco. And then that product had to clear customs. Correct. And then a carrier, maybe UPS, maybe FedEx, maybe the post office, took that product from the American port to Amazon's warehouse. Well, most of the products actually stopped at the port, I guess. And there were a couple that did go beyond and were found later at the general warehouse in New Jersey. If they hadn't been intercepted. If they hadn't been intercepted. But there's actually nothing in the record indicating where those that were not intercepted actually came from. So the products where we know where they came from, we know they're across the border, they were intercepted. Okay. And if they hadn't been intercepted, they would have been taken by, let's say, UPS to an Amazon warehouse. Correct. A lot of them, for example, were addressed in the Golden State. And then after they get to the warehouse, Amazon ships the product from the warehouse to the buyer. So, yes, they're placed in the buyer's inventory. I can elaborate for a long time on that, but I'll try to be concise here. They're placed in those sellers' inventory when a buyer purchases. Let's say you purchase this particular product. Somebody at the FC will pick it, either ships it in a container or puts it in a box. And depending on where you live, if you live in a major metro area, Amazon Logistics may handle that delivery or it may be shipped via mail or UPS. Okay. And then this is my last question. It's somewhat separate topic, kind of big picture. It's really dangerous if, you know, diseases get into the country. This is what Judge Rogers was talking about. It's also really lucrative for Amazon to be able to, you know, do what it's doing. So, you know, what do you say to the argument that Amazon wants all the money that comes from this very lucrative business opportunity and it doesn't want to be responsible for any of the risks that that creates for the country? Well, I don't know that's necessarily a fair proposition. I think there's a lot of debates on whether to what degree that business is actually profitable. Amazon does actually undertake a lot of efforts to make sure that third-party sellers are selling safely. So Amazon invests a lot of money in identifying product restrictions, enforcing product restrictions. As an example, if you try to list a piece of prohibited memorabilia or like a gun, for example, on the website, Amazon systems will find that and take that down pretty much instantly before it's even exposed to the marketplace. So Amazon actually makes a lot of efforts to make sure that people get safe and compliant products. Amazon does not necessarily have the ambitions where it can discern, OK, this product is coming to us from Shenzhen. Well, where is this country of origin? Because that's where it all matters. It's the country of origin. And is there a certificate? Because a certificate doesn't have to come all the way to the fulfillment center. A certificate just has to be presented to the court. So, I mean, we can hypothesize all kinds of things about what more could be done, but it's really problematic, especially in adjudication, talking about a single entity, creating retrospective duties based on the idea that something more, something worth this more could have been done. OK, thank you, counsel. We'll give you some time for rebuttal. Mr. Hinchelwood. Good morning, Your Honor. May it please the court, Brad Hinchelwood for the Department of Agriculture. I think it's useful to start by just focusing a little bit about on what exactly the ALJ here held and then how the case was litigated. I mean, the theory that the ALJ held Amazon liable on, if you look at page 414 to 15 of the JA, is a theory that Amazon's conduct here induced the importation of these products. Now, Amazon, in its appeal to the judicial officer and then its subsequent briefs in this court, has launched really a broadside attack on the concept of secondary liability under these statutes. And I'm happy to get into that. But I think it's useful to focus on the fact that, at least as an initial matter, what the ALJ here held is that Amazon's conduct in saying to these shippers, hey, if you import your products in the United States to us, we will keep them in our inventory. We will pick them, pack them, ship them, handle returns, provide a certain level of customer service. If you do that, you know, and all you have to do is import your products to us here in the United States. And that's sort of the core of the conduct here. And I think it's worth noting, I think an implication of Amazon's position and my colleague's presentation just now, is that there's any number of every other entity involved in that importation. The shipper in Asia, the carrier who brings that product from Asia to the United States and across the border, the party that makes entry at the border. Amazon's view, I take it, is that all of those entities are subject to liability without respect to knowledge. But somehow Amazon, the entity that actually is the reason all of this is happening, and that coffee has sort of induced this importation in the first place, is the only entity that escapes liability under this official label. Let me tell you what I did this morning. I went on eBay and I thought maybe I'll buy some Chinese duck tongue. And I found some for $21.29 that is located in China. It said free economy shipping from greater China to worldwide. Now, I didn't buy it. But imagine I did. Imagine it had been shipped to me without the right certification. I open it. I enjoy the Chinese duck tongue. Am I liable for civil aiding and abetting? I'm not sure exactly how the agency would address that, but it's certainly possible, Your Honor. I mean, I think the statutes themselves contemplate the possibility that individual violators will be subject to a violation of the statutes. And I think it goes to the important... What if I open it? I see that it lacks certification. Maybe there's even a note in it that says this never had the right certification for importation. And I report that to the government. I don't eat the duck tongue. I call the Department of Agriculture. Am I still liable for civil aiding and abetting? Your Honor, insofar as the act that would be prohibited, assuming that this product requires a certification, is the importation, I don't think that could change the liability. But I think it's worth emphasizing the department is not going to spend its enforcement resources on a situation like that. So all I have to do is trust my friendly neighborhood ag official to not bring an enforcement action against me. Or maybe if they do bring an enforcement action, not to make the penalty as high as $500,000. Well, Your Honor, in the case of the consumer you've just described, the statute actually caps the penalty at no more than $1,000. So, you know, Congress has in fact contemplated, you know, that there might be individuals who are not culpable, sort of caught up in these situations, and it has calibrated the penalties accordingly. But that duck tongue is no less dangerous. You have to admit, you have to admit, that's a pretty breathtaking composition that end consumers, end consumers are within the crosshairs of a statute that can impose $1,000 of liability on them for something they know absolutely nothing about. So the government's position is that Congress intended the statute, Congress intended in the statute to cover end consumers of products from overseas. Your Honor, I mean, think about the situation of an individual who carries a product across the border in their luggage, not knowing that it's there, right? I think everyone, including Amazon, recognizes that person can be subject to a civil penalty, even though they have no culpability, right? Right, I mean, there's some things that statutes might necessarily have to cover, and ultimately we have to rely on enforcement discretion. I get that. And fortunately, you know, that reliance can be well placed in a lot of instances. But the notion that the statute actually intends to cover totally innocent end users and end receivers, who all they're doing is ordering a project from overseas, having no – these are people who have no ability to do anything like Amazon. Well, Your Honor, I think if you scale it up and you say, you know, I'm a small business and I order, you know, 1,000 packages of Duck Tongue, and it turns out those things are not – I don't think the scale is what Congress was focused on here, because the scale doesn't matter for purposes of how dangerous the products are. I guess the question is, which way does that cut? Because it seems to me that if the statute doesn't cover end users, then I'm not sure how it covers even large-scale purchasers unless they're actually actively participating in importing, carrying, moving. Otherwise, all the concepts that are pretty well-heeled about innocent business behavior not coming within the compass of responsibility and liability come to the fore, because it's just true. I don't think there's any question that large-scale purchasers and especially somebody on the scale of Amazon could do a ton – they absolutely could do a ton to help prevent noxious and dangerous products from coming into the U.S. There's no doubt they could. The question is whether Congress intended them to. And if the only way that Congress intended them to is through a mechanism that also would ensnare innocent third-party end consumers, I have to ask whether the statute actually is best read in that way. Well, Your Honor, I'm not sure that you're really a third party in that circumstance, but in any event, it's certainly not the case that the court would necessarily have to. Yeah, you're right. I misspoke. But with end consumers – not third-party end consumers – if the way the statute brings Amazon in this case within its fold means that end consumers are also brought within its fold, I think you have to ask some pretty serious questions about whether that's the best reading of the statute. Well, Your Honor, I think it's useful, again, to go back to the specific factual sort of context here and what the agency actually held with respect to Amazon's conduct. So, again, Amazon is doing something far more than just placing an order for a product, right? I mean, what the ALJ here concluded was that Amazon had, through its particular conduct with respect to these shippers, induced the importation. And then Amazon has just tried to sort of throw out the idea that there's just a knowledge requirement across the board for all four, A, the bad cause or induced. Then where in the statute – I think I understand the argument that Amazon might be able to induce in a way that one random consumer wouldn't because Amazon can say, if you work with me, I'm going to open the seeds up and you're going to be way more profitable because I'm going to introduce you to 100 million consumers that you otherwise wouldn't have access to as opposed to one person who orders duck tongue from Louisville, Kentucky. So I can understand why there's a scale difference, but where in this – what is it in the statute that actually draws meaningful distinction between those two circumstances? Well, Your Honor – Go ahead. Well, I mean, I think what the department was actually sort of put to deciding here, what the ALJ actually decided, was whether Amazon had induced the importation or not. And so to the extent, Your Honor, I suggested there might be a distinction in the ability of an individual consumer to induce as opposed to a corporation like Amazon to induce, then that would potentially be a basis on which to draw that line. How could you induce any more than buying the product? It seems like the purchaser is the ultimate inducer of the importation. They're the ones paying the seller to ship it. Well, Your Honor, that's why I gave you the answer I did at the outset of this conversation, but I think that goes back. I mean, that again goes back to the fact that, you know, the fact that a single product can, you know, create the kinds of harms that Congress is concerned about. And that's why, you know, again, the department is not spending its time and resources going around and finding every person who orders a single item off of eBay or what have you. But, you know, at the same time, Congress recognizes that, you know, a single product can cause the kind of destruction that it's concerned about. Can you point to any precedent where a court's created a duty to discover a third party's wrongdoing under the guise of secondary liability? And I know you talk about Iran Air and Federal Express, but there it was Iran Air and FedEx who were actually doing the carrying across the border, I think. So what's your best precedent where a court has created a duty to discover third party wrongdoing under the guise of secondary liability? Well, Your Honor, I mean, I think, I mean, A, Iran Air and Federal Express obviously are secondary liability cases. And whatever you think about the specific activities they're on, I think they're not third party liability, right? Because they were directly carrying the product across the border. Sure. But again, Your Honor, I mean, I want to resist the idea that Amazon is somehow being held liable for the actions of third parties. It's being held liable for what it did. It's being held liable for its inducement of these importations, which were, in fact, unlawful. Which would be true of an end consumer. That's on the same theory as an end consumer. Your Honor, again, to the extent that there is, you know, a perceived unfairness about imposing penalties without culpability or without liability, and that's true of any scheme in which there is not a knowledge requirement. I don't even think it's perceived. It's not perceived unfairness in the abstract. It's just what we think Congress intended with the statute. And it's just hard to read this statute, or any statute for that matter, as reflective of a congressional intention to ensnare end consumers. Really, that's somebody who induces the carrying, entering, importing, shipping, or transportation as a consumer who buys it. And it seems to me there's got to be a difference between an end consumer and Amazon, or else it's really hard to read the statute the way the government does. Well, Your Honor, again, I haven't seen a case where the agency has enforced the statute in that fashion. So, you know, I can't say as a matter of, you know, precise fact what the agency would do, how the judicial officer would rule on an instance like that. I'm certainly not going to sit here and rule it out. But at the same time, you know, I think if you look at the text and structure of the statutes and understand the reason these statutes are written the way that they are, which is to protect American agriculture and public health, you know, and recognize that there are, frankly, I think very analogous situations where an individual, you know, might purchase a product overseas and carry it back in their luggage, not knowing that it lacks a certificate. I take your point that you think here, you know, Amazon is not being held responsible for a third party's wrongdoing. Amazon actually did the wrongdoing. So maybe let me rephrase my question about precedence a little bit. Can you give me a precedent where, under the guise of secondary liability, a court said the defendant's wrongdoing is that it failed to stop someone else's wrongdoing? I mean, I know there are cases, I can't give you a case off the top of my head. I know there are cases, for example, discussed in Halberstam that talk about the difficult question of whether omissions can count as assistance. And I'm not, I couldn't tell you exactly how all those cases have come out, but I know this issue has arisen. But, you know, I think the law often draws a distinction between action and inaction, whether it's tort law or whether it's the Commerce Clause. And you could probably come up with 10 other examples or 110 other examples. And this goes a little bit to the chief judge's question. I think, you know, if you're going to say what Amazon did wrong was it failed to act, you're shaking your head. I think that would require more statutory support than, you know, maybe a typical statutory interpretation. You're shaking your head. Go ahead. I'm shaking my head only because I don't think it's accurate to characterize what the department held here as that Amazon's responsible for what it didn't do. I mean, Amazon's responsible for what it did, which is that it induced the importation of these crops. It turned out Amazon was doing its normal business practice here. And my understanding is that that normal business practice is not at all illegal in many situations. I think that's fair to say. It turns out to be a particular product. Its wrongdoing here was its failure to deviate from its ordinary business practice. The wrongdoing is that these products were unlawfully imported and Amazon induced the importation of those products that were unlawfully imported. That's the wrongdoing. Now, if the question is, what more could Amazon have done if it wants to, you know, for example, continue to engage in these practices in the future and avoid liability? There are certainly steps Amazon could take. The ALJ identified some, for example. And I think my colleague recognized that Amazon could, in fact, do other things if it wants to continue to engage in importing these products that Congress has identified as especially concerning, especially dangerous because of the risk that they pose. In terms of the role of Amazon and the wrongdoing, I was going to ask about whether the government's theory encompasses selling on Amazon. I mean, the fact that it encompasses end consumers, I think, answers that question. But there's it seems to me there's no distinction between fulfillment by Amazon and selling on Amazon. Because Amazon is clearly inducing importation when it allows third party sellers to sell via Amazon because it opens up a marketplace that the third party seller otherwise would have more difficulty accessing. What I can tell you on that is the judicial officer here and the ALJ both considered arguments from Amazon that this would sweep in something like Craigslist, right? So sort of a website where people post, you know, essentially classified ads. And it said, look, you know, Amazon's conduct here is meaningfully different. The fulfillment by Amazon program is meaningfully different from what a service like Craigslist provides. But all of that would apply to selling on Amazon, too. Selling on Amazon is volitional business conduct by Amazon that induces wrongdoing in the same way that fulfillment by Amazon does. Although I know you get the warehouse with fulfillment by Amazon and you get assistance with the actual purchasing selling transaction. But selling on Amazon also is a huge boon to overseas sellers. But I'm not sure that Amazon or sorry, that the department would say that that induces, you know, importation in the same way. Certainly given that there's not the same level of involvement from Amazon here in the purely selling by Amazon, particularly where, I mean, if you look at page 4960 of the JA, the judicial officer distinguished something like Craigslist under the sort of inducement theory of the statute. So, you know, I'm not necessarily I'm not sure that the selling on Amazon program alone would, you know, would lead to the same kind of. I don't know what the distinction would be because selling on Amazon absolutely is a big boon to third parties and it induces in the same way because it induces by encouraging by. Well, I think what's different here, what makes this case at a minimum, a much easier one is that Amazon is actually inducing the importation. Right. I mean, the whole point here is get your product to Amazon's warehouse so that you can take advantage of all the services that Amazon's then going to provide, you know, once it's in the warehouse. And so the entire sort of relationship here starts from the premise of, you know, we want you or in company to ship your products, import your products to us in the United States. And we will give you sort of we will we will then take it from there. And that's really the core of what the ALJ and the judicial officer here found to be. If Amazon says if you sell on Amazon, you're going to be able to sell a ton more product in the U.S. because U.S. consumers have done all the empirical assessments and it's got to be true. The people who have the ability to purchase things on Amazon are much more likely to buy it than if they don't have the ability to purchase it on Amazon. And so the argument would be you have access to a customer base in the U.S. that you would absolutely not have access to. Otherwise, you should use sell on Amazon. And that definitely encourages implications because it causes the third party seller to sell it to U.S. consumers in a way that they otherwise wouldn't be able to do. I mean, your honor, again, you're using I mean, hey, you're using the phrase encourages. And I'm not sure exactly what theory of the statute that's going to fall under, if at all. I'm just trying to use a synonym for induce, but I just use induce. Yeah. Again, you know, something like Craigslist allows the same sort of thing, right? Allows somebody to post their products for sale in the United States and then, you know, would obviously handle their own fulfillment and shipment from overseas to the United States. Because, you know, that, you know, the ALJ here and the judicial officer didn't seem to think that that conduct would necessarily fall within the scope of the statute, within the scope of inducement. And I think this goes to, you know, I sort of resist the notion that there are sort of, you know, no limits on the ability of the agency to impose or that the agency itself has any interest in imposing liability on, you know, sort of every entity on the face of the earth. I think that's where I just want to hear you focus for a moment. In other words, if the court were to write an opinion that is focused solely on the facts of this case, which are undisputed. Although I heard counsel this morning trying to question some things, but I think it's been accepted in the record that Amazon's market is, and the services it provides, are sufficiently distinct from anything an individual consumer could offer. That the individual consumer case is simply not before the court. Because there are many statutes where, I'll put it in criminal terms, a prosecutor has broad authority and does not fully exercise it. So here, in a civil context, you have a comparable situation where you don't want to give anything up on behalf of the department, but we can acknowledge that today the department has not brought to us the case of individual liability. Such as posed by Judge Walker's hypothetical. And that there is no need for the court to issue an advisory opinion on that circumstance. And that the statute's books are full of statutes that can be misapplied, but that's not at least the way the department has presented this case to us. Rather that this case, in the department's view, clearly falls within the authority of the department, based on the ALJ's approach about inducement. And that a lot of the difficult questions that could arise in another context simply aren't before us. And I'm troubled because I don't think you can speak, and I think you've made this clear, on behalf of precisely how the department would face some other situations. But rather here, I mean, Elizana is the elephant in the room in terms of inducement here. And that's what the court is confronted with. Now, the court may still decide to rule against the department, but it seems to me that it's a legitimate argument that hypotheticals can be posed. And, you know, we're seeing this in the gun area. To what extent are parents held criminally responsible for the actions of their children, particularly in the gun area? So these are not unsensitive areas of law. And certainly there is an understanding of why Congress would proceed as it has here, where it's talking about the type of devastating plagues that occur, where you have the elephant in the room. And that's this case before us, and we can either take it or leave it. But I don't think coming up with hypotheticals, and I know one of our colleagues famously said, well, we have to look at the implications of our decisions, and there's no question about that. But the court has recently been advised by the chief legal officer for the executive branch how to handle these situations. And it seems to me that that is appropriate in this type of case as well. So, you know, by conceding some things where you're not in a position to respond, it doesn't seem to me you've given away the ball game. Rather, those are issues for another day. And I'm concerned because I think that Amazon's attorney has presented a very forceful argument if we were dealing, in my view, not with the type of volume, services, and potential marketplace. And the very dangerous products that potentially can be imported. And customs may have responsibilities. The railroads and airlines may have responsibilities. But can anyone who is involved in some way in inducement escape any responsibility whatsoever? So what's wrong with our approaching the case that way? Your Honor, I certainly think this court could decide, you know, just on the basis of, you know, Amazon's conduct here and leave for another day sort of subsequent questions if such an enforcement action is brought and comes before this court. I certainly think that would be an appropriate way to proceed. You know, I think, frankly, you know, the conduct here is such that, you know, if Amazon can't be held liable under these statutes, it's very hard to see how anybody could possibly be held liable, you know, under the sort of pay-to-bat, cause-induced language of these statutes, given the conduct here. Unless the language of the statute, the text of the statute is simply too vague and all-encompassing. Because Amazon is saying, we had no prior notice of all these obligations that are being suggested by the department. You know, we were just doing what we normally do. We made an offer. And if somebody wants to accept it, that's their decision. You know, and we may make our offer attractive, but that doesn't implicate us in any unlawful activity. That's what I hear them say. And, you know, that's the department's problem or it's Congress's problem to figure out what happened in that situation, and it hasn't. And it's simply dropped the ball. Your Honor, I mean, I take that to be Amazon's view. I mean, we haven't actually discussed very much today the actual text and structure of these statutes. But, you know, I think what the agency here held and was exactly what this court recognized in both Federal Express and Iran Air, which is that where you have a statute that provides that criminal penalties can be imposed knowingly, but that civil penalties have no mens rea requirement attached, that that is exactly the kind of statute that lends itself to imposition of civil penalties without knowledge. I might actually agree with you on that. I might actually agree with you on that. At least I'm open to agreeing with you on that. And I do want to talk about the structure of the statute because I think as I was indicating my call to counsel on the other side, I think there's a way to read a statute that's structurally sound that cordons that one off. But before we get to that, I do want to get to that. I want to follow up on Judge Rogers' question in the following way. The implications for this case cover fulfillment by Amazon and all the activities of fulfillment by Amazon undertakes. And I asked the question about selling on Amazon, and I just want to draw your attention to JA 467. And this is the judicial officer's decision. And sort of maybe halfway down the first partial paragraph at the top of this page, here the foreign third-party sellers gained access to millions of potential customers in the United States who use the Amazon.com website and were afforded the opportunity for business growth and exposure. It's inconceivable that the many benefits provided foreign third-party sellers via Amazon through FBA and SOA would not influence the decision to import the restricted products into the United States. And so as I read the judicial officer's decision by its own terms, the whole logic about inducement, because that's what we're talking about here, applies equally to SOA as to FBA. So it applies equally to selling on Amazon as fulfillment by Amazon. Is that not the way to read that? Yeah, I don't think so. I think the specific, you know, paragraph you're referring to there is, you know, in the course of the judicial officer's discussion of Culbertson, you know, rather than in his sort of laying out the whole structure of what's going on. And I think it's meaningful there that the judicial officer says, look, it's the benefits through the combination of FBA and SOA. Of course, you can't participate in fulfillment by Amazon if you aren't also selling on Amazon. So, you know, I don't think you necessarily would read that as compelling any particular conclusion that selling on Amazon has the same problem. I don't think it means FBA insofar as FBA also incorporates SOA, because it's saying FBA and SOA. I mean, I know we're not reading a statute. I don't mean to suggest that we're doing, you know, expressing a union stuff on the language of a judicial officer's decision. But I just think I understand what the judicial officer's saying, because the judicial officer's logic, and I totally get this, is that Amazon through the services it provides by both FBA and SOA is absolutely inducing third-party sellers to use its services because it's going to reach millions of customers, millions of potential customers in the United States. I guess my only point is that because it speaks in terms of both FBA and SOA, it seems to me that the logic, the inducement logic, that you're very understandably emphasizing as the reason that we would find that the judicial officer permissibly concluded FBA is within the statute would also naturally apply to SOA. And then if that naturally applies to SOA, that's just then you're getting in consumer land. Your Honor, again, I just think this particular sentence you're referring to just has to be read in its context. The judicial officer there is distinguishing Culbertson, and the 10th Circuit in Culbertson essentially said that that individual had no influence whatsoever over the movement of the infected cattle in that particular case. And so I think the judicial officer is saying, look, however you want to slice it, you know, Amazon definitely had an influence over the movement of these products. This case is very different from Culbertson just on its facts, even setting aside that you don't think Culbertson has any legal relevance here. But, you know, I would just, you know, I wouldn't suggest that a single sentence that happens to reference selling on Amazon, you know, compels any particular conclusion about whether selling on Amazon alone would qualify as inducement, you know, particularly given that the facts the judicial officer lays out, you know, earlier in his opinion, you know, sort of walks through the whole, you know, sort of scene and all those sort of things that go into the fulfillment by Amazon program that sort of actually led to the importation here. Can I follow up on the structure of the statute? So let's suppose that you're right, that because of the absence of knowingly in the civil penalty provision, that means that strict liability is available to the government under the civil penalty provision and it's not under the criminal penalty provision. Let's suppose that's right and that's the logic of FedEx and you're understandably seizing on that in your argument. It seems to me there's still a route by which the government doesn't prevail here and that preserves strict liability for violations and that's that aiding and abetting and causing and inducing, modify, importing, carrying, mailing, shipping, and transporting. And so, at least as a logical matter, it could be that certain activity doesn't satisfy that part of the statute. But if it did satisfy it, then you wouldn't need to know about the violation. You just seared and snared just as a matter of strict liability. That would preserve the government's ability to bring actions against entities and individuals who may not know about the ultimate violation, but they would be entities and individuals that would be deemed to have done enough to constitute aiding and abetting, causing and inducing, the carrying, importing, shipping, et cetera. Does that make sense? I don't think I disagree with anything you just said. I think, in fact, you just described this case. I mean, the point is that Amazon induced the importation of these products. I mean, that's exactly what the agency here held. I mean, it's not that Amazon induced something that's not carrying, importing, entering, shipping. The whole point is that Amazon moved these products because it induced the importation of these products. I don't disagree. I know you resist this assumption, but suppose that I disagree with you on that, and I think Amazon didn't do enough to cause and induce. But I still don't have to say then, I think, that the statute forecloses strict liability, because I think I could still say the statute actually allows for strict liability for unknowing violations. It's just that you don't come within the fold of the statute unless you aid, abet, cause, and induce, and you have to first satisfy that layer. This case, by hypothesis, gets off at that layer, but for somebody who comes within the fold, like a shipper, for example, you're carrying, inducing, there could be strict liability. At least we don't have to answer that question. Your Honor, I mean, so certainly I think there are distinct questions under the statute. I would just emphasize, in the case of the shipper, for example, that person is engaged in the primary conduct of carrying. So you don't need to get into secondary liability principles at all for that type of person. The only reason secondary liability is relevant, in this case, for example, is that Amazon isn't actually doing the actual carrying, what it has done for importation or whatever. It is inducing that conduct on the part of others. Other people are engaged in the primary conduct that Amazon has induced. Yeah, and I think your point is well taken, that if we give the words aid, abet, cause, and induce some meaning, the Venn diagrams have to work so that there's some broader circle that's encompassed by that that's not already encompassed by the primary conduct of shipping, carrying, importing. I take the point, but I still think it's true that even if we deem this conduct to be outside the ken of aiding and abetting, causing and inducing, that doesn't answer the question of whether the statute encompasses strict liability for civil penalty. It could still encompass strict liability for civil penalty. Right, I mean, yeah, if you said, regardless of whether there's a knowledge requirement or not, this conduct does not, you know, suffice for aid, abet, cause, induce, then, right, you wouldn't necessarily be commenting on the question of whether there is, in fact, a knowledge requirement. But, you know, again, as I was sort of saying in my call with Judge Rogers earlier, I mean, it's sort of hard to picture how this sort of conduct where Amazon, you know, again, these products are being pre-registered with Amazon, Amazon knows what's coming, Amazon wants it to be there, and Amazon is encouraging these shippers to send the stuff to them, to import it to them in the first place so that Amazon can hold it and carry on with all the other activities that it's going to engage in here. If this kind of conduct doesn't qualify, I mean, if you imagine a company where that was their only business, right, not an Amazon, but just somebody whose entire business was, I am the company in the United States that you ship your plant and animal products to, and then I will do all the things Amazon does through its fulfillment by Amazon service, I think it would be very, very difficult to sit here and say, well, somehow that company is the only one in the chain that escapes liability, right, that everybody else can be subject to liability, but not the reason these products are here in the first place, right, not the company that's actually the reason the stuff is here. Right, and I guess to get back to the very beginning, the question would be, well, if that's also true of an end consumer, then where does that leave us in reading the statute? But I understand your view. I would just emphasize, you know, I think it's useful. I recognize that result can seem harsh, but I think it's useful to just bear in mind, I don't see a huge difference between the individual who buys a product right before they get on the plane and carries it over the border, versus someone, you know, not knowing any of the same things, versus someone who orders the product while they're sitting at their computer in the United States and it comes across the border, it's, you know, to me those things don't seem particularly different. Congress has addressed that through, you know, the penalties provisions and the agency itself just doesn't have an interest in, you know, making people's lives needlessly difficult. It's focused on trying to prevent, you know, the spread of diseases that can be spread by a single product. I mean, that's the reality here. Let me make sure my colleagues don't have additional questions for you. Can you briefly respond to Amazon's argument that no Chevron deference should apply here because the agency has asserted that its interpretation is compelled by Congress and we have precedents, the Supreme Court has precedents that say if the agency says the interpretation is compelled by the statute, then there's no deference. I think Amazon has latched onto a single sentence in the judicial officer's opinion that says, you know, essentially that even if there were a settled common law meaning of these terms that was important to the statutes, which there is not, even if that were true, you know, the text and structure of these statutes would displace that meaning. And I think you said would compel rejection of Amazon's argument. I think if you read the decision as a whole, I mean, the judicial officer is taking into account text, structure, history of these statutes, and also the statutory sort of policy and purposes. And so at that point, you know, I think that's absolutely a situation where ordinarily this court would, you know, if it perceived an ambiguity in the statute, you know, I take your point about what was done before today, but today what is the agency's position? Is the interpretation you're asserting compelled by the statute? Your Honor, I honestly have not asked the agency that specific question. I mean, I think certainly the reading of the statute, the agency's put forward is, you know, more than plausible one. I mean, it certainly matches the way this court is interpreting comparable statutes, both in federal express and Iran air, but also in the mine act context and other statutory contexts that have similar structures. You know, so I, but I haven't asked the specific question of whether they think it's compelled or not, you know, obviously. Whereas doubts about that as opposed to, as you can answer that question, but, you know, I think if you read the opinion as a whole, you get a sense that the agency is really taking into account all the relevant considerations in reaching its conclusion. And I have one last question about what your understanding of inducement means. I know you, you say here that Amazon induced the, the movement. And I think the reason that you think they induced it is that they, they, they made it, they created so many incentives for it to happen that they made it a lot more likely to happen. That's sort of right. So what might involve what your theory is. I think, right. I mean, an inducement, right. It's usually a promise. So try to get you. Assume that the post office takes the product from the port to the warehouse and then on to the customer. Did the postal service induce the movement into the country? I think I'm actually glad you asked this because I think it gets to some important distinctions. So again, it may depend on the specific type of restriction the secretary has imposed. So some products have restrictions on their domestic movement. Other products have restrictions on their international movement, their importation. So there may not be subsequent restrictions imposed on the products after they crossed the border. Once they're in the United States, if the thought is you have prepared it safely, you have given the certificate showing that it's safely prepared. There may not be further restrictions on the domestic movement of the product. So I think it varies a lot from product to product and, you know, from pest or disease to pest or disease. So, you know, I don't think it's a, you know, I'm not aware specifically here of any further domestic movement restrictions on some of these products. For example, the plant protection act violations involved a product that actually couldn't be imported at all for commercial purposes. And so there may have been further domestic restrictions on that product movement. But just to make clear, it doesn't follow that every single entity that is involved in the domestic movement would necessarily be committing a separate violation. I do have one follow-up question on Chevron. I'm glad we got down there because I meant to ask it earlier. So if, and this is separate from whether the best way to read the judicial officer's opinion is that the reading that is encompassed by that agency is that it's not a Chevron, it's not a Chevron step one sense. Let's just put that to one side. If all an agency does is to say, we're looking at the statute and we're applying traditional Canada construction in the same way that a court would. And we think the better reading of that, that's typically not Chevron worthy because the agency isn't bringing to bear its own expertise and its policymaking and lawmaking expertise on the answer to the question of how is the statutory ambiguity resolved? And that's the Peter Pan decision and other decisions in that line. And as I read the judicial officer's opinion, it's an exercise in statutory interpretation, but it doesn't seem to be one in which the agency, and this is, it's, it's odd to think about adjudications this way to some extent, but it doesn't seem to be a one in which the agency is saying, we see that there's a statutory ambiguity and our policymaking and lawmaking expertise causes us to think the better reading is that it encompasses the statute, encompasses activities like those that are in play here vis-a-vis Amazon, as opposed to not. It's really if I apply a Canon X or Canon Y in exactly the same way that a court would, this is the, what I think Congress intended the statute to reach, not what I think in the exercise of my delegated lawmaking power, I think the statute should reach within the fold of the ambiguity that Congress left. Certainly your honor, there are aspects of the decision that, you know, obviously walk through the text and structure of the statutes and apply and address the arguments Amazon has raised. Now I think there are also aspects of the decision, some of which Amazon spends a great deal of its brief criticizing that go through and sort of talk about the policy considerations implicated if Amazon were correct and it somehow escaped liability despite its conduct here that, you know, these are remedial statutes that the agency ought to interpret broadly. You know, these are things that Amazon aspects of the reasoning Amazon criticizes. Where's the best part for you on, on the agency exercising its delegated policy slash lawmaking authority to construe the statute, as opposed to doing what courts do, which is try to figure out what the best reading is what Congress intended. I mean, the specific discussion I was just referring to is, you know, happens on pages four 63 and four 64 of the joint appendix where it sort of the sheriff's officer walks through those elements. I mean, look, certainly I thought that's the best place to, I thought that's the best place to, and the one thing that I noticed about that is first of all, it's at the very end of a lot of other stuff about that, that just sort of standard what courts do. And courts often at the end of their opinion say the statutory purposes are best served by this reading as opposed to the other. And to me, that's what this read like. And part of that is that in the footnote 107, which is appended to the sentence that says Amazon's interpretation works against the respective congressional purpose, that's citing a judicial decision that does what courts do as opposed to this is us in our policymaking role, telling you that we think as an exercise of delegated lawmaking authority, this is the way the statute should work. Yeah. I think that specific vision there that's being cited actually defers to the agency's interpretation of its regulation. So yeah, I don't know. I mean, it's quite as straightforward as all that, but yeah, to, to the extent the court, you know, thinks there's an ambiguity and the agency has the authority to fill it, you know, with, to, you know, address that ambiguity within the scope of it. You know, obviously the agency could do that. I mean, I think, you know, you can read the decision here as a whole and get a very clear sense of how the agency views the statutes and the authority that it's operating under. You know, so I don't know that that sort of approach is necessary here, but you know, I certainly recognize the print the principle that these courts cases, you know, have have articulated. Okay. Thank you. Let me make sure there's no additional questions. Thank you, Mr. Engelwood. Mr. Murphy, we'll give you the three minutes you asked for, for rebuttal. Thank you. I appreciate it. The position of the government that I heard the last couple of minutes of argument is scary. In the government's view, Congress intended that billions of American consumers who happen to buy products that originated, they'd be liable for aiding and abetting, not because they actually carried it across the board. They haven't gone across the board at all. All they've done is sat at their computer and ordered a product. That could not possibly be what Congress intended in these statutes. And that highlights the absolute necessity for a limiting principle when, when you use words like aid, abet, cause, or induce. The answer to Judge Walker's question about the duck tongue is absolutely you are not aiding, abetting, causing, or inducing. Because under the traditional concepts of secondary liability, liability has been recognized for centuries at all levels. You could not be liable because you have no knowledge of the wrongdoing and you did not substantially assist it. Now you could be said to induce the importation in a very broad sense, in the same way that a bank can be said to induce a bank robbery or a depositor could be said to induce bank robbery by having money collected in one place. This is a great hypothetical from Judge Easterbrook in the Chicago plaintiffs order, the Chicago Civil Rights Committee versus Mike Smith. But that is not at all a useful meaning of induce or cause. Focus on induce, that word actually does have a discreet meaning. It not only has a mens rea element, but an actual action element. And if we look at that definition in Black's Law Dictionary, and I'm looking at the seventh edition because that's the edition that encompasses 2000 and 2002, these two statutes were passed. Inducement is what the act or process of enticing or persuading another person to take a certain cause of action. That's at a much higher level of granularity than some of these hypotheticals we've been passing back and forth about operating a business. If we divorce inducement from its legal meaning, it's possible to say almost anything that induces a telephone company induces crime because it makes available some service that makes it easier. And this court and National Organization for Women recognize that induce, just like aid and that, and other secondary liability concepts, has these longstanding culpability elements. There is a longstanding secondary liability where it takes all of these elements with it. To address another question posed by Judge Walker, is there any precedent on duty to discover third party wrongdoing? There is, and it goes against the government. It's investors research and Howard versus SEC, two cases from this circuit and I can see that. One question. So on the, on your own black law dictionary definition, enticing was one of the words you use, right? Enticing. Yes. Yeah. Is it not fair to think that Amazon fulfillment entices third party sellers to import goods into the U S? Well, no, I think, I think you have to read this in context of enticing or persuading another person to take a certain cause of action. So I think you, a certain what? A certain cause of action. So is that what it says? A certain cause of action? A certain or a certain course of action. I'm sorry. Yeah. So, so it actually focuses on the very specific conduct and there's nothing in the record at all. But if the certain course of action is sending goods to the U S which is important, important exportation from that perspective, but importation into the U S probably not fair to say that Amazon enticed that course of action. No, I don't, I don't think that's necessarily right because I think you have to look at a very high level of granularity and what is the record on what these three specific sellers and where they, what are their other channels of sales? There's nothing in the record to indicate that we have no idea why these three third party sellers did what they get, whether, whether they did it to whether that other sales channel that supermarkets suppose, suppose there, there's a record that's developed. That's where a third party seller says the reason I'm doing this is because of Amazon. I mean, there are other companies can do something similar, but nobody's like Amazon. Amazon is the one that's persuading me to send goods to the U S then would you think that's inducement? Well, I think you have to get into the actual culpability, but just on whether it's induced, I mean, there may be situations hypothetically yet if there were a record where there's somebody in a company that calls up another, a foreign party and says, Hey, I really want it. I really want your business. I want you to, I want you to ship it to us in this way. I can keep situations where that might cost to the act as reason, but not both satisfied. But, and, but the mens rea only go, if the mens rea only goes to whether there's a violation, then all we're talking about is the actus reas of inducement. Cause you know that you're doing the inducement and you know that the goods are going to be important. Well, I think you have to read the mens rea as inherent in the terms aid, effect, cause, or induce the general awareness of wrongdoing. So you need for this, for these purposes, you are reading knowingly back into aid, effect. And the Supreme Court's case in Roseland was cited in the entire basis of that decision was the distinct intent elements in those books. So yeah. So those words carry their own distinct intent. They do, but it's, it doesn't have to be, aid and effect can be knowingly doing the thing that's being aided and abetted, namely knowingly importing. Right. It doesn't have to be knowingly violating, which is in a separate statute. Yeah. But I think what this court has, has focused on on the actual elements of aiding and abetting and so forth, and however some are, you have to have the awareness of that for long. All right. Make sure your colleagues don't have additional questions. Thank you counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Walker, Rogers